**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| DAVITA INC.; STAR DIALYSIS, LLC, | No. 19-15963 |
| Plaintiffs-Appellants, | D.C. No. 4:18-cv-06975-JST |
| v. | |
| AMY'S KITCHEN, INC.; AMY'S KITCHEN, INC. EMPLOYEE BENEFIT HEALTH PLAN, | OPINION |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the Northern District of California
Jon S. Tigar, District Judge, Presiding

Argued and Submitted October 8, 2020
Seattle, Washington

Before: Susan P. Graber and William A. Fletcher, Circuit Judges, and Leslie E. Kobayashi,* District Judge.

Opinion by Judge Graber

GRABER, Circuit Judge:

Renal dialysis is a life-saving treatment for those with serious kidney afflictions, including acute kidney injury and end-stage renal disease ("ESRD").

---

\* The Honorable Leslie E. Kobayashi, United States District Judge for the District of Hawaii, sitting by designation.

Plaintiffs DaVita, Inc., and Star Dialysis (collectively, "DaVita") provide dialysis treatment to many patients and seek payment from any applicable group health plan. One of DaVita's patients is a beneficiary of Defendant Amy's Kitchen's Employee Benefit Health Plan ("Amy's Plan" or "the Plan"), a health plan offered and administered by Defendant Amy's Kitchen, Inc. ("Amy's Kitchen"). The patient has ESRD and has received routine maintenance dialysis from DaVita. Amy's Plan covers all types of dialysis, regardless of the underlying diagnosis, but the Plan's reimbursement rate for dialysis differs from the rate it pays for many other services. The Plan paid DaVita according to the Plan's terms.

Dissatisfied with the payment amounts that it received from Amy's Plan, DaVita brought this action, arguing that the Plan's dialysis provisions violate (1) the Medicare as Secondary Payer provisions ("MSP") of the Social Security Act, (2) the Employee Retirement Income Security Act of 1974 ("ERISA"), and (3) state law. The district court dismissed the federal claims and declined to exercise supplemental jurisdiction over the state-law claims. With respect to the MSP claim, the court held that, because the Plan reimburses at the same rate for all dialysis services, regardless of underlying diagnosis and regardless of Medicare eligibility, the Plan does not violate the MSP. Reviewing de novo and taking the allegations in the complaint as true, Daewoo Elecs. Am., Inc. v. Opta Corp., 875

F.3d 1241, 1246 (9th Cir. 2017), we agree with the district court's conclusions and therefore affirm.

FACTUAL AND PROCEDURAL HISTORY

Doctors classify chronic kidney disease into five stages. The last stage, Stage 5, is known as kidney failure or ESRD. More than 700,000 people in the United States have ESRD. To survive, a person with ESRD requires either a kidney transplant or routine maintenance dialysis, a treatment that performs the functions of a kidney. 42 C.F.R. § 406.13(b); see also Kidney Disease Statistics for the United States, Nat'l Insts. of Health (December 2016), https://www.niddk.nih.gov/health-information/health-statistics/kidney-disease. Most persons with ESRD never receive a kidney transplant, so they receive regular maintenance dialysis for the remainder of their lives. According to DaVita, a person with ESRD typically receives dialysis three times a week. Persons with ESRD are eligible for Medicare pursuant to 42 U.S.C. § 426-1 after the first three months of regular dialysis treatment.

People with ESRD are not the only recipients of dialysis. The other common recipients of dialysis are those with "acute kidney injury," described by the National Kidney Foundation as "a sudden episode of kidney failure or kidney damage that happens within a few hours or a few days." Acute Kidney Injury, Nat'l Kidney Found. (Oct. 30, 2020), https://www.kidney.org/atoz/content/

3

AcuteKidneyInjury. Acute kidney injury has many different causes and correlated diseases. Id. Recently, for example, a study cited by the National Kidney Foundation concluded that "people hospitalized with COVID-19 are at significant risk of [acute kidney injury]." Kidney Disease and COVID-19, Nat'l Kidney Found., https://www.kidney.org/coronavirus/kidney-disease-covid-19 (last visited Nov. 16, 2020). Treatment of acute kidney injury restores long-term kidney function. Accordingly, unlike persons with ESRD, persons with acute kidney injury generally recover enough kidney function so that they no longer need dialysis. Similarly, unlike persons with ESRD, persons with acute kidney injury are not eligible for Medicare pursuant to 42 U.S.C. § 426-1.

When a patient with ESRD is enrolled in both Medicare and a group health plan, the MSP allocates primary-payer responsibility between Medicare and the plan. Once the individual becomes eligible for Medicare, which occurs after three months of dialysis treatment, the plan remains the primary payer and Medicare becomes the secondary payer during a 30-month coordination period. 42 U.S.C. § 1395y(b)(1)(C)(i). When the coordination period ends, the plan may be the secondary payer thereafter. Id. § 1395y(b)(1)(C).

The MSP also imposes two substantive requirements on group health plans with respect to persons with ESRD. First, during the coordination period, a plan may not "take into account" a person's eligibility for Medicare due to ESRD. Id.

4

§ 1395y(b)(1)(C)(i). Second, a plan may not "differentiate in the benefits it provides between individuals having [ESRD] and other individuals covered by [the] plan on the basis of the existence of [ESRD], the need for renal dialysis, or in any other manner." Id. § 1395y(b)(1)(C)(ii).

Amy's Kitchen sells organic foods throughout the United States and employs more than 2,400 people. Many employees are eligible to enroll in Amy's Plan, which is an "employee benefit plan" pursuant to ERISA. Amy's Plan is a preferred provider organization health plan. A beneficiary may visit any medical provider, some of which are "in-network" and some of which are "out-of-network." For many medical services, the Plan provides no coverage at all, whether that service is given by an in-network or an out-of-network provider. But for most services covered by the Plan, the processing of claims depends on whether the beneficiary visits an in-network provider or an out-of-network provider. Visiting an in-network provider generally results in lower copayments and other advantages for beneficiaries. The Plan typically pays in-network providers according to a rate determined by contract and pays out-of-network providers, in the words of the Plan, the "Customary, Usual, and Reasonable Charge" for the service.

"Patient 1" is a beneficiary of Amy's Plan who has ESRD. Patient 1 began receiving regular dialysis treatment in 2016 from DaVita. At the time, DaVita was

an in-network provider, and the Plan reimbursed DaVita at the appropriate contractual rate.

In 2017, Amy's Plan modified its terms of coverage by implementing a "Dialysis Benefit Preservation Program."  The Plan explained that it had found evidence of "significant inflation" of prices charged by dialysis providers; the use of inflated revenues "to subsidize reduced prices to other types of payers as incentives"; and "the specific targeting of the Plan and other non-governmental and non-commercial plans by the dialysis providers as profit centers."  The Plan implemented the program because of its

> fiduciary obligation to preserve Plan assets against charges which (i) exceed reasonable value due to factors not beneficial to covered persons . . . and (ii) are used by the dialysis providers for purposes contrary to the covered persons' interests, such as subsidies for other plans and discriminatory profit-taking.

The Program applies to all claims for "reimbursement of products and services provided for purposes of outpatient dialysis, regardless of the condition causing the need for dialysis."  The Plan no longer uses the in-network/out-of-network distinction for dialysis-related reimbursements.  Instead, "[a]ll dialysis-related claims will be subject to cost review by the plan administrator to determine whether the charges indicate the effects of market concentration or discrimination in charges."

> With respect to dialysis-related claims, the plan administrator shall determine the Usual and Reasonable Charge based upon the average

6

payment actually made for reasonably comparable services and/or supplies to all providers of the same services and/or supplies by all types of plans in the applicable market during the preceding calendar year, based upon reasonably available data, adjusted for the national Consumer Price Index medical care rate of inflation.

The "Usual and Reasonable Charge" differs from the "Customary, Usual, and Reasonable Charge" that applies to reimbursements for some other types of medical treatment.

DaVita alleges that the reimbursements that it received beginning in 2017 were far less than the reimbursements that it received in 2016. DaVita brought this action, alleging claims on its own behalf and as an assignee of Patient 1's claims. DaVita alleges that the Plan's 2017 implementation of the dialysis-specific program violated the MSP, ERISA, and state law. The district court dismissed with prejudice all federal claims and declined to exercise supplemental jurisdiction over the state-law claims. DaVita timely appeals.

DISCUSSION

A.    MSP Claim

The MSP imposes two substantive requirements on group health plans with respect to persons with ESRD. A group health plan:

(i) may not take into account that an individual is entitled to or eligible for benefits under this subchapter under section 426-1 of this title [during the 30-month coordination period]; and

(ii) may not differentiate in the benefits it provides between individuals having end stage renal disease and other individuals covered by such

7

plan on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner[.]

42 U.S.C. § 1395y(b)(1)(C). Amy's Plan uniformly reimburses all dialysis treatments whether or not the beneficiary is eligible for Medicare and whether or not the beneficiary has ESRD. And dialysis is a treatment received by many people: some are eligible for Medicare and some are ineligible; some have ESRD and some do not have ESRD. DaVita nevertheless argues that, because the Plan allegedly pays less for dialysis treatments than for other treatments, the Plan violates both of the MSP's requirements. For the reasons that follow, we disagree.

1. "Take Into Account"

The MSP prohibits a plan from taking into account whether the covered individual is eligible for or enrolled in Medicare during the coordination period, after which time the plan may be the secondary payer. See id. § 1395y(b)(1)(C)(i) (providing that a plan "may not take into account that an individual is entitled to or eligible for [Medicare] benefits" (emphasis added)). The Plan plainly did not take into account Patient 1's eligibility for, or enrollment in, Medicare. The Plan uniformly reimburses all dialysis treatment, whether or not the beneficiary is eligible for Medicare or enrolled in Medicare.

Notably, many persons who receive dialysis are ineligible for Medicare: those with acute kidney injury are not, by virtue of that injury, eligible for Medicare, and even those who have ESRD are eligible for Medicare only after the

8

first three months of dialysis treatment. Yet the Plan takes no notice whatsoever of whether the claimant is eligible for Medicare. Claims are paid at the same rate whether the claimant has acute kidney injury, is in the first months of ESRD treatment, or is eligible for Medicare.

Nor does it matter, for purposes of the MSP, that the Plan calculates its reimbursement rate by taking into account, along with other factors, the amount that Medicare pays for dialysis treatment of other individuals. The MSP bars consideration of the individual claimant's eligibility for Medicare, a factor that the Plan ignores.

Finally, our reading of the "take into account" provision renders neither that provision nor the differentiation provision superfluous. Both provisions serve functions that the other does not. The "take into account" provision prohibits a plan from taking Medicare eligibility into account during the 30-month coordination period and permits a plan to become the secondary payer after the coordination period. Nothing in the differentiation provision concerns who pays first. Similarly, the differentiation provision prohibits a plan from differentiating against any person who has ESRD, including a person who is ineligible for Medicare.

In sum, Amy's Plan did not "take into account" Patient 1's eligibility for Medicare and thus comported with the MSP's first requirement.

## 2. Differentiation

The MSP provides that a plan "may not differentiate in the benefits it provides between individuals having end stage renal disease and other individuals covered by such plan on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner." 42 U.S.C. § 1395y(b)(1)(C)(ii). Under the Plan, individuals with ESRD receive identical benefits, including dialysis benefits, as those who do not have ESRD. Renal dialysis is a potential treatment for all persons, not just for those with ESRD, and the Plan uniformly reimburses a provider for renal dialysis whether or not the patient has ESRD. Accordingly, the Plan does not—in any way or for any reason—"differentiate in the benefits it provides between individuals having end stage renal disease and other individuals covered by such plan." Id.

The second half of the statutory text does not change that conclusion. Plans may not provide differing benefits to persons with ESRD "on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner." Id. The clause is grammatically challenging to interpret, because "on the basis of" appears to apply to "the need for renal dialysis" but cannot meaningfully apply to "in any other manner." See DaVita, Inc. v. Marietta Mem'l Hosp. Empl. Health Benefit Plan, 978 F.3d 326, 361 (6th Cir. 2020) (Murphy, J., concurring in part and dissenting in part) ("This list likely contains a typo because it makes no

10

sense to say 'on the basis of . . . in any other manner.'" (ellipsis in original)). The corresponding regulation slips in an "or" to address the grammatical issue, prohibiting differentiation "on the basis of the existence of ESRD, or the need for renal dialysis, or in any other manner." 42 C.F.R. § 411.161(b)(1) (emphasis added). But we need not dwell on the nuances. Even the broadest possible reading of the second half of the statutory text—prohibiting differentiation in the provision of benefits for any reason and in any manner—does not change our interpretation of the requirement as a whole.

A plan may not provide differing benefits to persons with ESRD than to other insureds, no matter the reason and no matter the manner. For example, a plan may not provide differing benefits to persons with ESRD simply because an individual has ESRD, or because an individual with ESRD needs renal dialysis, or because an individual with ESRD has a greater statistical chance of needing other services. See 42 U.S.C. § 1395y(b)(1)(C)(ii) (prohibiting differentiation "on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner"). And a plan may not provide differing benefits to persons with ESRD by, for example, terminating their coverage, charging higher premiums, exacting higher co-payments, or requiring longer waiting times. 42 C.F.R. § 411.611(b)(2)(i)-(iii). But the pertinent question remains whether the plan provides differing benefits to persons with ESRD than to all other insureds.

11

Because Amy's Plan provides identical benefits, including dialysis benefits, to all insured persons, the Plan does not run afoul of the MSP.

We do not hold that all facially neutral plans comply with the MSP. A facially neutral provision that, in effect, operated to differentiate "between individuals having end stage renal disease and other individuals covered by such plan" would not comport with the MSP. 42 U.S.C. § 1395y(b)(1)(C)(ii). For example, a plan would violate the MSP if it provided different coverage for routine maintenance dialysis—that is, dialysis received only by persons with ESRD—than for all other dialysis. See 42 C.F.R. § 411.161(b)(2)(v) (listing, as an example of a prohibited differentiation, a plan's "[f]ailure to cover routine maintenance dialysis . . . when a plan covers other dialysis services"). So, too, would a plan violate the MSP if it declined to cover an ESRD-specific medication even though it covered comparable non-ESRD-specific medications. That is, provisions that affect only those with ESRD necessarily provide differing benefits to those with ESRD as compared to other insureds.

But Amy's Plan has no such differentiating effect. The Plan treats all dialysis the same, and persons with ESRD are not the exclusive recipients of dialysis. Many persons who do not have ESRD receive dialysis as treatment for

12

acute kidney injury.[1]

DaVita concedes that dialysis is not exclusively a treatment for ESRD. But DaVita emphasizes that most people who receive dialysis have ESRD, so that Amy's Plan has a remarkably disproportionate effect on persons with ESRD. DaVita encourages us to hold that the MSP's prohibition on differing treatment bars not only actual differentiation (whether by name or by exclusive effect) but also all provisions that have a disproportionate effect, or disparate impact, on persons with ESRD.

In assessing whether the MSP encompasses a disparate-impact theory, we find helpful the Sixth Circuit's recent decision in Marietta, 978 F.3d at 347–52. Applying the Supreme Court's guidance in Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., 576 U.S. 519 (2015), the Sixth Circuit held that the MSP encompasses a disparate-impact theory. Marietta, 978 F.3d at 350–51. Judge Murphy disagreed with the majority's conclusion, writing separately to state his view that "a plan that uniformly offers the same benefits to all groups does not violate [the MSP's differentiation] clause."

_____

[1] In 2000, about 12,000 persons in the United States with acute kidney injury received dialysis. Pavkov ME, Harding JL, Burrows NR., Trends in Hospitalizations for Acute Kidney Injury — United States, 2000–2014, Morbidity & Mortality Wkly. Rep., March 16, 2018, 67:289–293, Table, https://www.cdc.gov/mmwr/volumes/67/wr/mm6710a2.htm. That number rose to 18,000 by 2006. Id. And in 2014, the number climbed to more than 28,000. Id.

Id. at 360 (Murphy, J., dissenting in part).  We agree with the Sixth Circuit that the Supreme Court's decision in Inclusive Communities provides the appropriate framework for considering whether a statute encompasses a disparate-impact theory, but we disagree with the Marietta majority's conclusion.

Inclusive Communities considered whether the Fair Housing Act ("FHA") encompassed a disparate-impact theory of liability.  576 U.S. at 533–34.  The Court began its analysis by discussing "two other antidiscrimination statutes that preceded it"—Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967 ("ADEA")—that the Court previously had held encompassed disparate-impact liability.  Id. at 530–33; see Griggs v. Duke Power Co., 401 U.S. 424 (1971) (Title VII); Smith v. City of Jackson, 544 U.S. 228 (2005) (ADEA).  The Court discussed the obvious similarities in text and structure between the relevant provisions of Title VII and the ADEA, on the one hand, and the relevant provisions of the FHA, on the other.  Inclusive Communities, 576 U.S. at 534–35.  Title VII provides:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect

14

his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a) (emphases added); see Inclusive Communities, 576 U.S. at 530–31 (quoting this text). The ADEA provides:

It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.

29 U.S.C. § 623(a) (emphases added); see Inclusive Communities, 576 U.S. at 532 (quoting this text). The first relevant FHA provision states:

It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3605(a) (emphasis added); see Inclusive Communities, 576 U.S. at 534 (quoting this text). The second relevant FHA provision states that it is unlawful:

To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or

15

deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a) (emphasis added); see Inclusive Communities, 576 U.S. at 533 (quoting this text).

The Court noted that the only textual difference is that Title VII and the ADEA use the phrase "or otherwise adversely affect" while the FHA uses the phrase "or otherwise make unavailable or deny."[2] Inclusive Communities, 576 U.S. at 532–33. But the Court held that the different wording was irrelevant because both formulations, and the word "discriminate," are "results-oriented language," which "counsels in favor of recognizing disparate-impact liability." Id. at 534. The Court explained further:

> It is true that Congress did not reiterate Title VII's exact language in the FHA, but that is because to do so would have made the relevant sentence awkward and unclear. A provision making it unlawful to "refuse to sell[,] ... or otherwise [adversely affect], a dwelling to any person" because of a protected trait would be grammatically obtuse, difficult to interpret, and far more expansive in scope than Congress likely intended.

Id. at 535 (alterations and ellipsis in original).

---

[2] In its briefing to us, DaVita also cites the disparate-impact provision in the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112. But that statute's text, which prohibits many forms of "discriminat[ion]," does not differ meaningfully from the relevant text of Title VII or the ADEA. Id. § 12112(a); see also id. § 12112(b)(3) (defining ways that an entity may impermissibly discriminate to include "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability" (emphasis added)).

16

The Supreme Court next found later amendments to the FHA, enacted in light of intervening court decisions, to be of "crucial importance." Id. In particular, "all nine Courts of Appeals to have addressed the question had concluded that the Fair Housing Act encompassed disparate-impact claims." Id. When Congress amended the FHA, it chose to retain the relevant statutory text and, moreover, added three new clauses that made sense only if the FHA encompassed a disparate-impact theory of liability. Id. at 536–39.

Finally, the Court held that "[r]ecognition of disparate-impact claims is consistent with the FHA's central purpose." Id. at 539. "The FHA, like Title VII and the ADEA, was enacted to eradicate discriminatory practices within a sector of our Nation's economy." Id.; see also id. at 528–30 (recounting the long history of discriminatory housing).

The Court made clear that its conclusion that the FHA encompassed a disparate-impact theory resulted from considering all of the factors just discussed: "The Court holds that disparate-impact claims are cognizable under the Fair Housing Act upon considering its results-oriented language, the Court's interpretation of similar language in Title VII and the ADEA, Congress' ratification of disparate-impact claims in 1988 against the backdrop of the unanimous view of nine Courts of Appeals, and the statutory purpose." Id. at 545–

17

46; see also Smith, 544 U.S. at 237 (noting the unanimous holdings of the courts of appeal that the ADEA's prohibition encompasses disparate impacts).

Applying the teaching of Inclusive Communities, we begin, as did the Sixth Circuit, with the statutory text:

> [A group health plan] may not differentiate in the benefits it provides between individuals having end stage renal disease and other individuals covered by such plan on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner.

42 U.S.C. § 1395y(b)(1)(C)(ii) (emphases added). The Sixth Circuit's majority focused exclusively on the final five words of the provision: "or in any other manner." Marietta, 978 F.3d at 348–51. The court noted that, like the important statutory passage in the FHA, that passage is "at the end of a series of prohibitions that deal with disparate treatment" and "is exceedingly broad." Id. at 350 (emphasis omitted). From those observations, the Sixth Circuit concluded that the MSP's "non-differentiation provision permits a disparate impact claim." Id. at 351.

We respectfully suggest that the Marietta majority's analysis of whether the statute gives rise to a disparate-impact claim was incomplete. Not every list of actions followed by a broad catch-all clause means that Congress intended to encompass a disparate-impact theory. Inclusive Communities requires both a more detailed study of the statutory text and a consideration of other relevant factors.

First, continuing with the textual analysis, a different aspect of the provision strongly suggests that Congress did not intend to create a disparate-impact theory

18

of liability. In particular, Congress chose to prohibit actions that "differentiate" rather than "discriminate." Just as the FHA's use of the word "discriminate" suggested disparate-impact liability to the Supreme Court in light of the identical wording of Title VII and the ADEA, Inclusive Communities, 576 U.S. at 534, Congress' decision not to use the word "discriminate" in the MSP strongly suggests that it did not intend to encompass disparate-impact liability. The presumption that different words carry different meanings is ordinarily weak when applied, as here, to different Acts, because "[w]e do not presume that when Congress legislates it has firmly in mind every term of every pre-existing statute." Agredano v. Mutual of Omaha Cos., 75 F.3d 541, 544 (9th Cir. 1996). But Congress certainly was aware of the important term "discriminate," which long has carried a particular meaning. We find it significant that Congress chose to avoid that common term in favor of a different verb, "differentiate." See Hall v. United States, 566 U.S. 506, 516 (2012) ("We assume that Congress is aware of existing law when it passes legislation." (internal quotation marks omitted)); see also Bare v. Barr, 975 F.3d 952, 968 (9th Cir. 2020) ("We must presume that Congress intended a different meaning when it uses different words in connection with the same subject." (internal quotation marks omitted)).

Read as a whole, then, the statutory text does not suggest that Congress intended to sweep in actions that disproportionately affect persons with ESRD

19

under a disparate-impact theory. We may agree with the Sixth Circuit that the phrase "or in any other manner" is "results-oriented" in a sense. Marietta, 978 F.3d at 350 & n.15. But the statutory text makes clear that the pertinent inquiry remains whether the plan's provisions "result" in different benefits for persons with ESRD, not whether the plan's provisions disproportionately affect persons with ESRD or otherwise "discriminate" against persons with ESRD.

Nor is there any indication that Congress acquiesced in a disparate-impact theory that has been widely adopted by the federal courts. If anything, the MSP's statutory history and additional provisions suggest the opposite conclusion. For example, until just a couple of months ago, no court had held that the MSP encompasses a disparate-impact theory of liability. See, e.g., Nat'l Renal All., LLC v. Blue Cross & Blue Shield of Ga., Inc., 598 F. Supp. 2d 1344, 1354–55 (N.D. Ga. 2009) (rejecting, as failing to state a claim, an assertion that a plan's uniform reimbursement for all dialysis constituted differentiation under the MSP). Additionally, and unlike the FHA, no other provision in the MSP assumes that the differentiation provision encompasses disparate-impact liability. Indeed, nearly every provision in the MSP concerns topics other than ESRD. In sum, one factor that was "of crucial importance," Inclusive Communities, 576 U.S. at 535, in concluding that the FHA encompasses disparate impacts is, at best, completely absent with respect to the MSP.

Finally, we consider the statute's "central purpose." Id. at 539. This factor, too, strongly suggests that Congress did not intend a disparate-impact theory of liability in the MSP. All of the anti-discrimination statutes cited by DaVita and the Sixth Circuit sought to address, as their sole or central purpose, a history of discrimination against a minority class of persons. As their titles suggest, the Fair Housing Act, Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, and the Americans with Disabilities Act all aimed, as their central purpose, to address longstanding and entrenched discriminatory practices.

By sharp contrast, there is little evidence, either in the legislative history of the MSP or in other sources, that persons with ESRD have been subjected to historical or entrenched societal discrimination akin to the discrimination faced by the classes of persons protected by the FHA, Title VII, the ADEA, and the ADA.[3] As we hold in DaVita v. Virginia Mason Memorial Hospital, No. 19-35692, - F.3d – (9th Cir. 2020), ensuring equal health-care benefits for insureds who have ESRD, in limited circumstances, is one of the purposes of the Medicare

---

[3] DaVita directs us primarily to a Senate Report in 1981—eight years before Congress added the differentiation provision—that expressed "concern[]" that employers might engage in "job discrimination" against persons entitled to Medicare. S. Rep. No. 97-139, at 736 (1981). Congress directed the relevant Secretary to "investigate promptly complaints of this nature[] and report his findings to the Congress." Id. That level of concern pales in comparison to, for example, Congress' deep concern with the entrenched historical discrimination in housing on the basis of race. Inclusive Communities, 576 U.S. at 528–30.

as Secondary Payer provisions. But the tightly cabined nature of the anti-differentiation provision of the MSP suggests a carefully circumscribed concern, not a remedy for widespread injustice. Moreover, the "central purpose," Inclusive Communities, 576 U.S. at 539, of the MSP provisions remains a congressional aim to save Medicare money. See Zinman v. Shalala, 67 F.3d 841, 845 (9th Cir. 1995) (noting that "the overarching statutory purpose" of the Medicare as Secondary Payer provisions is to "reduc[e] Medicare costs").

Although this case concerns a plan's reimbursement rates for dialysis, a disparate-impact theory presumably could give rise to a broad array of challenges. Notably, approximately half of persons with ESRD have diabetes or cardiovascular disease, and cardiovascular disease "contributes to more than half of all deaths among patients with ESRD." Kidney Disease Statistics for the United States, Nat'l Insts. of Health (December 2016), https://www.niddk.nih.gov/health-information/health-statistics/kidney-disease. Accordingly, a plan that provided less preferential coverage for those ailments might disproportionately affect persons with ESRD. Embracing a disparate-impact theory of liability would create uncertainty for insurers as to permissible provisions related to those illnesses. We doubt that Congress intended, in a statute aimed almost entirely at saving Medicare money, to require group health plans to ensure that its plans have no disproportionate effects on persons with ESRD. Rather, we conclude that

22

Congress meant what it said: a plan may not "differentiate in the benefits it provides between individuals having [ESRD] and other individuals covered by such plan." 42 U.S.C. § 1395y(b)(1)(C)(ii).

In sum, consideration of the relevant factors described in Inclusive Communities confirms our reading of the statutory text. Congress prohibited group health plans from offering different benefits to persons with ESRD than to others, but it did not bar other differences that merely have a disproportionate effect on persons with ESRD.

Although congressional intent is clear, we also note that the MSP's implementing regulations provide no support for a disparate-impact claim. In both Smith, 544 U.S. at 239, and Griggs, 401 U.S. at 433–34, the Supreme Court interpreted the pertinent statutory provision as encompassing a disparate-impact theory partly because the relevant agency had interpreted the statute in that manner. Similarly, although the Court in Inclusive Communities did not discuss the agency's interpretation in its analysis, the Court noted at the outset that "the Secretary of Housing and Urban Development issued a regulation interpreting the FHA to encompass disparate-impact liability," including by establishing a multi-step "burden-shifting framework." 576 U.S. at 527 (abbreviation omitted).

23

The relevant regulations here tell a different story. Perhaps most convincingly, the agency expressly approved a plan provision that would have a clearly disproportionate effect on those with ESRD:

> (c) Uniform Limitations on particular services permissible. A plan is not prohibited from limiting covered utilization of a particular service as long as the limitation applies uniformly to all plan enrollees. For instance, if a plan limits its coverage of renal dialysis sessions to 30 per year for all plan enrollees, the plan would not be differentiating in the benefits it provides between plan enrollees who have ESRD and those who do not.

42 C.F.R. § 411.161(c). Persons with ESRD typically require three dialysis sessions a week, so the hypothetical limitation would apply to all persons with ESRD. Persons with acute kidney injury, by contrast, rarely require 30 sessions of dialysis. In other words, even though the regulation's hypothetical limitation would have an overwhelmingly disparate effect on persons with ESRD, the agency expressly approved the limitation as consistent with the MSP's differentiation provision.

Similarly, the agency's illustrative examples in § 411.161(b)(2)[4] all comport with our understanding of the statutory text. For example, a group health plan may

---

[4] The regulation provides:

> (2) [Group health plan] actions that constitute differentiation in plan benefits (and that may also constitute "taking into account" Medicare eligibility or entitlement) include, but are not limited to the following:

(continued)

24

not provide "less comprehensive health plan coverage" to "persons who have ESRD" and may not charge "individuals with ESRD higher premiums."  42 C.F.R. § 411.161(b)(2)(ii)-(iii).  As is most relevant here, a plan may not decline to cover "routine maintenance dialysis" if it covers "other dialysis services," and a plan must pay identically for dialysis for persons with ESRD as for dialysis for persons who do not have ESRD.  Id. § 411.161(b)(2)(iv)-(v).  That is, a plan may not cover

> (i) Terminating coverage of individuals with ESRD, when there is no basis for such termination unrelated to ESRD (such as failure to pay plan premiums) that would result in termination for individuals who do not have ESRD.
>
> (ii) Imposing on persons who have ESRD, but not on others enrolled in the plan, benefit limitations such as less comprehensive health plan coverage, reductions in benefits, exclusions of benefits, a higher deductible or coinsurance, a longer waiting period, a lower annual or lifetime benefit limit, or more restrictive preexisting illness limitations.
>
> (iii) Charging individuals with ESRD higher premiums.
>
> (iv) Paying providers and suppliers less for services furnished to individuals who have ESRD than for the same services furnished to those who do not have ESRD, such as paying 80 percent of the Medicare rate for renal dialysis on behalf of a plan enrollee who has ESRD and the usual, reasonable and customary charge for renal dialysis on behalf of an enrollee who does not have ESRD.
>
> (v) Failure to cover routine maintenance dialysis or kidney transplants, when a plan covers other dialysis services or other organ transplants.

42 C.F.R. § 411.161(b).

25

an exclusively-ESRD treatment differently than a comparable non-ESRD treatment; but nothing suggests that a plan must cover all dialysis treatments to the same extent as, say, chemotherapy or insulin treatments.

We acknowledge one potential exception to the foregoing analysis. One of the regulation's examples of impermissible differentiation is a plan's failure to cover kidney transplants when the plan covers other organ transplants. Id. § 411.161(b)(2)(v). DaVita cites an article published in 2015 on the topic of kidney transplants, Educational Guidance on Patient Referral to Kidney Transplantation, U.S. Dept. of Health & Hum. Servs., (Sept. 2015), https://optn.transplant.hrsa.gov/resources/guidance/educational-guidance-on-patient-referral-to-kidney-transplantation. "With advances in surgical technique, immunosuppression, and post-transplant care, criteria for kidney transplantation have evolved dramatically." Id. Given the long waiting times for finding a suitable kidney donor, the article recommends that doctors consider referring some patients, especially those with rapidly progressive kidney disease, for evaluation for a kidney transplant even if the patient is in stage 4 of chronic kidney disease, one stage shy of ESRD (stage 5). Id. DaVita asserts that some patients receive a kidney transplant before their disease progresses to ESRD. The regulation therefore suggests, in DaVita's view, that a disparate-impact theory is available.

26

The regulatory history does not reveal, when the agency promulgated the regulation in 1995, whether persons with stage 4 kidney disease received transplants; if so, whether the agency was aware of that fact; and if so, what the agency's reason for including the example was. We need not investigate those questions, though, because even if we assume that the agency included one example that would support a disparate-impact claim, it suggests, at most, that the regulation is inconsistent with respect to the availability of a disparate-impact claim. See Marietta, 978 F.3d at 351 ("Put simply, the non-differentiation regulations do more to confuse than to clarify."). Whether we view the implementing regulations for the MSP as foreclosing entirely a disparate-impact theory or as inconsistent on the question, those regulations are wholly unlike the implementing regulations for Title VII, the ADEA, and the FHA, which clearly allowed disparate-impact claims. The regulations therefore provide no support for a disparate-impact claim.

In conclusion, a plan that provides identical benefits to someone with ESRD as to someone without ESRD does not "differentiate" between those two classes. That simplistic approach must yield for treatments that apply exclusively to ESRD patients, because differential coverage of ESRD-specific treatments is no different than differential treatment of persons with ESRD. But for treatments that apply

27

both to those with ESRD and those without ESRD, a plan's provision of identical benefits does not "differentiate" on any basis at all.

Because Amy's Plan provides identical benefits, including dialysis benefits, to persons with ESRD as to all other insureds and does not consider an individual's eligibility for Medicare, Amy's Plan comports with the MSP.[5]

B.   ERISA Claims

ERISA authorizes a beneficiary to bring claims seeking "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). Separate ERISA provisions authorize a beneficiary to bring equitable claims, seeking either injunctive or equitable relief. Id. § 1132(a)(1)(A) & (a)(3). DaVita asserts both types of claims.

As DaVita acknowledges, it cannot bring ERISA claims on its own behalf. See id. § 1132(a)(1)(B) (allowing a claim for benefits "by a participant or beneficiary"); id. § 1132(a)(3) (allowing equitable claims "by a participant, beneficiary, or fiduciary"); Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc., 770 F.3d 1282, 1289 (9th Cir. 2014) ("As a non-participant health care provider, Spinedex cannot bring claims for benefits on its

_____

[5] Because both the 2016 version and the 2017 version of Amy's Plan comported with the MSP, it is irrelevant that the 2017 amendment modified only the dialysis provisions of Amy's Plan. See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995) ("[P]lan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.").

28

own behalf.").  DaVita seeks, instead, to bring claims on behalf of Patient 1, who signed a form assigning some causes of action to DaVita.

The assignment form plainly encompasses a claim seeking to recover benefits, so DaVita may bring that claim.  See Spinedex, 770 F.3d at 1288–91 (holding that a valid assignment of rights allows a third party to bring the beneficiary's claim).  But the complaint fails to state a claim.  All of DaVita's arguments stem from its argument, which we reject, that the Plan violates the MSP. Under the clear terms of the Plan, Patient 1 received all the "benefits due to him [or her] under the terms of [the] plan."  29 U.S.C. § 1132(a)(1)(B).

We conclude that DaVita may not bring the equitable claims, however, because the assignment form did not encompass an assignment of equitable claims. "The question of what rights and remedies pass with a given assignment depends upon the intent of the parties."  DB Healthcare, LLC v. Blue Cross Blue Shield of Ariz., Inc., 852 F.3d 868, 876 (9th Cir. 2017) (internal quotation marks omitted). To make that determination, "we look at the language and context of the authorization[]."  Id. at 877.

By signing the assignment form, Patient 1 agreed to thirteen numbered items.  The fifth item included this sentence:

> I hereby assign to DaVita all of my right, title and interest in any cause of action and/or any payment due to me (or my estate) under any employee benefit plan, insurance plan, union trust fund, or similar plan ("Plan"), under which I am a participant or beneficiary, for services,

29

drugs or supplies provided by DaVita to me for purposes of creating an assignment of benefits under ERISA or any other applicable law.

The Sixth Circuit recently held that a nearly identical assignment did not assign equitable claims, and we agree with its analysis on this point. Marietta, 978 F.3d at 344–45. The wording of the assignment itself suggests only an assignment of a claim for benefits: Patient 1 assigned "all of [Patient 1's] right, title and interest in any cause of action . . . under any employee benefit plan . . . for purposes of creating an assignment of benefits under ERISA or any other applicable law." (Emphasis added). The most natural reading of that sentence is that Patient 1 assigned all possible causes of action for the payment of benefits. The assignment of "any cause of action" is not superfluous because it refers to the causes of action available "under ERISA or any other applicable law," such as state contract law.

The broader context of the sentence confirms that interpretation. The title of numbered item five is "Assignment of Benefits; Lien." And all of the remaining sentences of the same paragraph—such as how the patient should handle payments, the "automatic lien," and the pursuit of "collections"—pertain strictly to payments. Zooming out further still, the overall purpose of the document similarly focuses exclusively on responsibility for payments, affirming that the patient "is personally responsible for payments"; noting that the patient is "assigning rights to payments from my insurer"; and "authorizing DaVita to obtain the necessary

30

information to obtain such <u>payments</u>."  (Emphases added.)  As in <u>Spinedex</u>, 770 F.3d at 1292, "the entirety of the Assignment indicates that [Patient 1] intended to assign to [DaVita] only [his or her] rights to bring suit for payment of benefits." <u>See also</u> <u>DB Healthcare</u>, 852 F.3d at 876–77 (holding that an assignment implicit in "I Hereby Authorize My Insurance Benefits to Be Paid Directly to the Physician" encompassed only a claim for benefits and not equitable claims).

**AFFIRMED.**